Judge KOEHL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

ANTOINETTE COSTANZO,

**12 CV 6958**

                                                Plaintiff.

**COMPLAINT
AND DEMAND FOR
JURY TRIAL**

            -against-



THE CITY OF NEW YORK, P.O. DONATO
AND POLICE OFFICER "JOHN DOE" (said
name being fictitious, as the true name is
presently unknown), individually and in their
Official Capacities.

                                                Defendants.

------------------------------------------------------------------x


        Plaintiff, ANTOINETTE COSTANZO, representing herself, *pro se*, complaining of
the defendants herein, respectfully shows the Court and alleges:

## PRELIMINARY STATEMENT

1.      Plaintiff brings this action for compensatory damages and punitive damages

        pursuant to 42 U.S.C. §§1981, 1983, and 1988, for the wrongful acts of

        Defendants THE CITY OF NEW YORK, P.O. DONATO, and POLICE OFFICER

        "JOHN DOE" (said name being fictitious, as the true name is presently unknown),

        as Officers of the New York City Police Department, acting under color of state

        law and pursuant to their authority, in violation of Plaintiff's rights secured by the

        Civil Rights Act of 1871, 42 U.S.C. §§1981, 1983, 1988; by the United States

Constitution, including its First, Forth, Fifth, Eighth, and Fourteenth Amendments; and by the laws and Constitution of the State of New York.

## JURISDICTION

2.    This action is brought pursuant to 42 U.S.C. §§1981, 1983 and 1988, and the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, and the constitutional, statutory, and common laws of the State of New York.

3.    Jurisdiction is invoked herein pursuant to the aforementioned statutory and constitutional provisions and pursuant to 28 U.S.C. §§1331, 1343, this being an action seeking redress for the violation of the plaintiff's constitutional and civil rights.

4.    Plaintiff further invokes this Court's pendent jurisdiction over any and all state-law claims and causes of action which derive from the same nucleus of operative facts that give rise to the federally based claims and causes of action pursuant to 28 U.S.C. §1367.

## VENUE

5.    Venue is properly laid in this District under 28 U.S.C. §1391(b), this being the District in which the claim arose.

## TRAIL BY JURY

6.    Plaintiff demands a trial by jury on each and every one of his claims as pled

herein pursuant to Fed., R. Civ. P.38(b).

## PARTIES

7.    At all times relevant hereto Plaintiff was and is a resident of New York County in

the State of New YOrk, in the Southern District of New York.

8.    At all times relevant hereto defendant THE CITY OF NEW YORK (hereinafter,

"NYC") was and is a municipality of the State of New York and owns, operates,

manages, directs, and controls the New York City Police Department, which

employs the other named Defendants.

9.    At all times relevant to this action, Defendants P.O. DONATO and POLICE

OFFICER JOHN DOE (said name being fictitious, as the true name is presently

unknown) are and were police officers employed by the New York City Police

Department (hereinafter "NYPD"), and acting under color of state law.  They are

being sued in both their individual and official capacities.

10.    At all times relevant hereto and in all his actions described herein, the

Defendants P.O. DONATO and POLICE OFFICER JOHN DOE (said name being

fictitious, as the true name is presently unknown) were acting under color of

statutes, ordinances, regulations, policies, customs, and usages of the NYPD

and NYC, pursuant to their authority as employees, servants, and agents of the

NYPD within the scope of employment and incidental to their otherwise lawful duties and functions as employees, servants, agents and police officers.

11.    NYC was responsible for the hiring, training, supervision, discipline, retention, and promotion of the police officers, sergeants, and/or employees of the NYPD.

## **FACTS**

12.    On or about November 15, 2011, at approximately 7:23 p.m., Plaintiff ANTOINETTE COSTANZO was standing astride a bicycle waiting at a steady red light on the corner of 104th Street and West End Avenue in the county of New York in the State of New York.

13.    Plaintiff, who commutes to and from work by bicycle was on her way from work to her home located at 215 West 105th Street, New York, New York.

14.    Plaintiff's bicycle was in full compliance with the with all city and state statutes regulating the manner and use of bicycles.  It had white front facing light, a red back facing light, and a bell.

15.    104th Street is a one way street.  Vehicular traffic moves from west to east. Plaintiff was standing astride her bicycle on 104th Street just west of West End Avenue.  Plaintiff's bicycle was facing east bound, the direction of the flow of traffic and Plaintiff had stopped her bicycle behind the pedestrian cross walk so that she would not block any pedestrian traffic crossing with the light in the north/south direction across 104th Street.

16.    As Plaintiff waited for the light to change to green so that she could lawfully cross West End Avenue and continue eastbound on 104th Street, a marked police car from the 24th precinct pulled up very close to the left side of Plaintiff's bicycle.

17.    No bicycle lane exists on 104th Street and Plaintiff's bicycle was stopped on the right hand side of the street a few feet from a lane of parked cars.

18.    There were two uniformed officers in the marked police car.  Both officers were male.  One was sitting in the driver's seat, and the other was sitting in the passenger's seat.  The Plaintiff now knows the the driver of the vehicle was P.O. DONATO of the 24th precinct, tax registry number 8991554, the identity of the passenger is unknown to Plaintiff and will be referred to as POLICE OFFICER JOHN DOE (said name being fictitious, as the true name is presently unknown).

19.    One of officer's told the plaintiff to move.  Plaintiff is unsure which officer said this to her.

20.    In response, Plaintiff gestured by raising her arm and pointing to the red light and responded in sum and substance, "what, through the red light?"

21.    At that point one of officers requested that the Plaintiff provide the officers with her identification.  Plaintiff is unsure as to which Police Officer made this request.

22.    Plaintiff removed her knapsack in order to locate her identification.  After locating her identification Plaintiff handed her New York State driver's license and her New York State Office of Court Administration identification card to POLICE OFFICER JOHN DOE (said name being fictitious, as the true name is presently unknown) who was sitting in the passenger's seat.

23.    P.O. DONATO AND POLICE OFFICER JOHN DOE (said name being fictitious, as the true name is presently unknown), now in possession of Plaintiff's identification then drove east on 104th Street and crossing over West End Avenue. The patrol car then stopped 104th Street on the east side of West End Avenue.

24.    Plaintiff was humiliated by the actions of P.O. DONATO and POLICE OFFICER JOHN DOE (said name being fictitious, as the true name is presently unknown) that left her standing in the street with no identification. A pedestrian walking her dog inquired as to what Plaintiff had done wrong.

25.    Plaintiff then secured her knapsack, and noticing that the traffic signal was again red, waited for the light to change to green so that she could lawfully cross over West End Avenue and meet up with the patrol car.

26.    When the light turned red, the Plaintiff pedaled her bicycle on 104th Street crossing over West End Avenue and rode to the driver's side door of the marked patrol car.

27.    When Plaintiff arrived at that location, Plaintiff awaited instructions and the return of Plaintiff's identification from the P.O. DONATO or POLICE OFFICER JOHN DOE (said name being fictitious, as the true name is presently unknown).

28.    P.O. DONATO informed Plaintiff that Plaintiff was standing in a location where she would block traffic attempting to go east bound on 104th Street towards Broadway.

29.    Plaintiff was not blocking traffic and it was reasonable that Plaintiff would have located herself next to the patrol car. Plaintiff was humiliated by P.O. DONATO's

actions and words which suggested that Plaintiff was acting unreasonably and without concern for passing traffic.

30.     Plaintiff informed P.O. DONATO that she was willing to go anywhere he instructed her and she awaited P.O. DONATO's instructions.

31.     Without returning Plaintiff's identification or providing her with instructions, P.O. DONATO drove the marked patrol car on 104th Street east towards Broadway. The marked patrol car then came to a stop on 104th Street on the west side of Broadway.

32.     Plaintiff was humiliated by P.O. DONATO's actions which left Plaintiff standing in the street repeatedly riding her bicycle after the police officers who were in possession of her identification.

33.     Plaintiff then rode her bicycle on 104th Street eastbound towards the patrol car.

34.     When Plaintiff arrived at the corner of 104th Street and Broadway, where Plaintiff had last seen the marked patrol car, the patrol car was not there. Plaintiff had no knowledge or information concerning the whereabouts of the patrol car. Plaintiff had not seen in which direction the patrol car had driven. P.O. DONATO and POLICE OFFICER JOHN DOE (said name being fictitious, as the true name is presently unknown) were still in possession of Plaintiff's identification.

35.     These actions of P.O. DONATO and POLICE OFFICER JOHN DOE (said name being fictitious, as the true name is presently unknown) further humiliated the Plaintiff.

36.    Plaintiff removed her knapsack in order to retrieve her cell phone and make a

phone call.  Plaintiff called attorney Beth Unger in an effort to seek advice as to

what actions Plaintiff should take in order to recover her identification.

37.    Plaintiff and attorney Beth Unger discussed whether Plaintiff should ride her

bicycle to the 24th precinct station house located on 100th Street between

Amsterdam and Columbus Avenues, or whether Plaintiff should wait where

Plaintiff had last seen the marked patrol car.

38.    Plaintiff was extremely concerned that leaving the area might be seen as an

attempt to evade police contact.  Plaintiff feared that leaving the area might

subject her to arrest by P.O. DONATO and POLICE OFFICER JOH DOE (said

name being fictitious, as the true name is presently unknown).  Additionally,

Plaintiff suffered anxiety in worrying about the fact that a P.O. DONATO and

POLICE OFFICER JOHN DOE (said name being fictitious, as the true name is

presently unknown) possessed Plaintiff's  identification which contained personal

identifying information which could be taken from Plaintiff and used to Plaintiff's

detriment.

39.    After discussing the matter with attorney Beth Unger, Plaintiff decided to remain

at the corner of 104th Street and Broadway for at some time to see whether the

patrol car would return.

40.    After some minutes the patrol car returned to 104th Street and Broadway.

41.    At the time that the patrol car arrived, Plaintiff was stopped on the right hand side

of the street.  The patrol car pulled up next to Plaintiff and P.O. DONATO leaned

over the POLICE OFFICER JOHN DOE (said name being fictitious, as the true

name is presently unknown) and handed Plaintiff a pink summons and her two pieces of identification.

42.    Plaintiff was humiliated when she was publicly issued a summons.

43.    The summons, number 433568225-6, charged Plaintiff with a violation of Penal Law §240.20(5), Disorderly Conduct.  The summons was returnable on January 23, 2012 at the Summons All Purpose Part 1 located at 346 Broadway in New York, New York.  The summons was signed by P.O. DONATO.

44.    Plaintiff is a criminal defense attorney employed by The Legal Aid Society. Plaintiff works the The Legal Aid Society's Manhattan office and appears daily in both Criminal Court and the Supreme Court Criminal Term courtrooms.  Plaintiff has made numerous appearances in the Summons All Purpose Part 1 at 346 Broadway in her capacity as a staff attorney with the Legal Aid Society.

45.    Additionally, Plaintiff recognized that were she to demand a trial on the charge contained in the summons that any trial would occur in the Criminal Court House located at 100 Centre Street in New York, New York.  As the Summons All Purpose Part 1 is presided over by a Judicial Hearing Officer who, with out the consent of the defendant, would by without jurisdiction to try the matter.

46.    The prospect of a trial in Criminal Court at 100 Centre Street caused Plaintiff great anxiety.  That Plaintiff would be a criminal defendant in the very courtroom where she is an advocate.  Being a defendant in criminal court would subject Plaintiff to the negative judgements of both attorneys in her own office, prosecutors in the New York Count District Attorneys Office, and judges in the courthouse.

47.     Further, Plaintiff had to notify her employer that she had been issued a summons

        charging an offense in the Penal Law, and explain to her employer that Plaintiff

        would likely appear in Court as a criminal defendant in the same courthouse as

        Plaintiff appears as an attorney.

48.     On November 16, 2011, Plaintiff informed Irwin Shaw, the head of the Manhattan

        Criminal Practice Office of the Legal Aid Society that Plaintiff had been issued a

        summons charging a Penal Law offense and would likely stand trial in the

        criminal courthouse located at 100 Centre Street, New York, New York.

49.     This disclosure humiliated Plaintiff.

50.     On January 31, 2012, on the day that the summons was returnable in the

        Summons Part 1 at 346 Broadway, Plaintiff appeared in the Courthouse.

51.     Plaintiff learned from a clerk in the building that the summons had been

        dismissed by the clerk.

52.     Later that same day, Plaintiff received a letter that had been mailed to her home

        stating that the summons had been dismissed and that Plaintiff did not have to

        appear in court.

53.     From November 15, 2011 to January 31, 2012 when Plaintiff learned that the

        summons had been dismissed, Plaintiff experienced anxiety and humiliation

        concerning the prospect that a trial would be held in the courthouse where

        Plaintiff practices law.

54.     From November 15, 2011 to January 31, 2012, Plaintiff experienced anxiety from

        the prospect that her career as an attorney with the Legal Aid Society would be

negatively implicated by the fact that Plaintiff would stand trial in the courthouse in which she practices law.

55.    Within 90 days of the incident, a Notice of Claim on behalf of Plaintiff ANTOINETTE COSTANZO was served upon NYC.

56.    On March 19, 2012, an oral examination on Plaintiff was conducted pursuant to Section 50-h of the General Municipal Law.

57.    At least thirty (30) days have elapsed since said demand and/or claim upon which this actions is in part predicated was presented to NYC for adjustment and NYC has neglected and/or refused to adjust and/or make payment.

58.    This action is commenced within one (1) year and ninety (90) days of the occurrence herein.


**FIRST CLAIM FOR RELIEF:**
**DEPRIVATION OF FEDERAL CIVIL RIGHTS**

59.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in paragraphs 1 through 56 with the same force and effect as if fully set forth herein.

60.    All of the aforementioned acts of Defendants, their agents, servants, and employees were carried out under color of state law.

61.    All of the aforementioned acts deprived Plaintiff ANTOINETTE COSTANZO of the rights, privileges, and immunities guaranteed citizens of the United States by the First, Fourth, Fifth, Eight, and Fourteenth Amendments of the Constitution of the United States and in violation of 42 U.S.C. §1983.

62.    The acts complained of were carried out by the aforementioned individual
       Defendants in their capacities as a police officers, with the entire actual and/or
       apparent authority attendant thereto.

63.    The acts complained of were carried out by the aforementioned individual
       Defendants in their capacity as a police officers, pursuant to the customs,
       usages, practices, procedures, and rules of NYC and the NYPD, all under the
       supervision of ranking officers of said department.

64.    Defendants, collectively and individually, while acting under color of state law,
       engaged in conduct which constituted a custom, usage, practice, procedure, or
       rule of their respective municipality/authority, which is forbidden by the First,
       Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States
       Constitution, in violation of 42 U.S.C. §1983, for which the Defendants are
       individually liable.


## SECOND CLAIM FOR RELIEF:
## CONSPIRACY TO VIOLATE CIVIL RIGHTS

65.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in
       paragraphs 1 through 62 with the same force and effect as if fully set forth herein.

66.    All of the aforementioned Defendants conspired to violate Plaintiff's civil rights by
       agreeing among themselves to prevent Plaintiff for exercising her rights to ride
       her bicycle lawfully on the streets of New York and to travel unencumbered and
       to be free from unreasonable searches and seizures and by agreeing among
       themselves not to prevent each other from violating Plaintiff's civil rights, as

described above, in violation of 42 U.S.C. §1985, for which the Defendants are individually liable.

67.    All of the aforementioned Defendants conspired to violate Plaintiff's civil rights by agreeing among themselves to falsely charge Plaintiff with Disorderly Conduct and testify falsely, as described above, in violation of 42 U.S.C. §1985, for which the Defendants are individually liable.

### THIRD CLAIM FOR RELIEF:
### FALSELY CHARGING THE PLAINTIFF

68.    Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs 1 through 66 with the same force and effect as if fully set forth herein.

69.    As a result of Defendants' aforementioned conduce, Plaintiff was subject to an illegal, improper, and false seizure, and prosecuted by the Defendants, without any probable cause, privilege, or consent.

70.    As a result of her false charge, Plaintiff was subjected to humiliation, anxiety, fear and disgrace.

71.    All of the aforementioned acts of the Defendants constituted a false accusation under the laws of the State of New York and the Defendants are liable for said damage.  Pursuant to 28 U.S.C. §1367, this Court has pendant jurisdiction to hear and adjudicate such claims.

### FOURTH CLAIM FOR RELIEF:
### MUNICIPAL LIABILITY

72.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in paragraphs 1 through 69 with the same force and effect as if fully set forth herein.

73.    Defendants P.O. DONATO and POLICE OFFICER JOHN DOE (said name being

fictitious, as the true name is presently unknown) unlawfully and without cause

ordered Plaintiff to provide them with identification and unlawfully and without

cause seized the Plaintiff by repeatedly driving away from Plaintiff while in

possession of Plaintiff's identification, and unlawfully and without cause falsely

summonsed the defendant on a charge of Disorderly Conduct, notwithstanding

their knowledge that such actions violated the Plaintiff's constitutional rights.

74.    The acts complained of were carried out by the aforementioned Defendants in

their capacities as police officers and officials, with the entire actual and/or

apparent authority attendant thereto.

75.    The acts complained of were carried out by the aforementioned individual

Defendant's in their capacities as police officers and officials pursuant to the

customs, policies, usages, practices, procedures, and rules of NYC and the

NYPD, all under the supervision of ranking officers of said department.

76.    The aforementioned customs, policies, usages, practices, procedures, and rules

of NYC and the NYPD included, but were not limited to, initiating criminal

proceedings without evidence of criminal activity.

77.    The foregoing customs, policies, usages, practices, procedures, and rule of NYC

and NYPD constituted deliberate indifference to the well-being and constitutional

rights of Plaintiff ANTOINETTE COSTANZO.

78.    The foregoing customs, policies, usages, practices, procedures, and rule of NYC

and NYPD were the proximate cause of the constitutional violations suffered by

Plaintiff ANTOINETTE COSTANZO.

79. The foregoing customs, policies, usages, practices, procedures, and rule of NYC and NYPD were the moving force behind the constitutional violations suffered by Plaintiff ANTOINETTE COSTANZO.

80. Defendant's, collectively and individually, while acting under color of state law, were directly and actively involved in violating the constitutional rights of Plaintiff ANTOINETTE COSTANZO.

81. Defendants, collectively ad individually, while acting under color of state law, acquiesced in a pattern of unconstitutional conduct by subordinate police officers and were directly responsible for the violation of Plaintiff's constitutional rights.

82. Defendant NYC, as municipal policymaker in the training and supervision of Defendant police officers, has pursued a policy and custom of deliberate indifference to the rights of persons in their domain who suffer violations of their right to be free from unlawful depravations of freedom, and their rights to be free from unreasonable searches and seizures, without Due process of law in violation of the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. §1983, and the Constitution and laws of the State of New York.

83. All of the foregoing acts by Defendants deprived Plaintiff ANTOINETTE COSTANZO of federally protected rights, including, but not limited to, the right:

    1.1.    Not to be deprived of liberty without due process of law;

    1.2.    To be free from unreasonable search and seizure under the Fourth and Fourteenth Amendments of the United States Constitution.

1.3.    To be protected against violations of her civil and constitutional rights, including, but not limited to, her rights under the First, Fourth, Fifth, and Eighth Amendments of the United States Constitution.

1.4.    To be free from infliction of emotional distress;

1.5.    To receive equal protection under the law; and

1.6.    Not to be deprived of substantive due process of law.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgement and prays for the following relief, jointly and severally, against the Defendants"

1.    Special and compensatory damages in the amount of TWENTY THOUSAND ($20,000) DOLLARS: and

2.    Punitive damages in the amount of TWENTY THOUSAND ($20,000) DOLLARS; and

3.    Such other and further relief as this Court Deems just and proper.


DATED:  AUGUST 13, 2012

Respectfully submitted,

ANTOINETTE COSTANZO
Pro Se
215 West 105th Street, #2D
New York, N.Y. 10025
646 334-6392
acostanzo2@yahoo.com

1

AA-500.2 (1/06)

# SUMMONS

## 433568225-6

The People of The State of New York VS

Susp/Rev. Check ☐ Yes   No ☐
Motorist-Exhibted License ☐ Yes   No ☐

Last Name: *Costanzo*   First Name: *Antoinette*   M.I.

Street Address: *215 w 105*   Apt. No.: *21*

City: *New York*   State: *NY*   Zip Code: *10025*

ID Number:

Lic. No.: *54 691 496*   Date of Birth: *3 29 61* F

Lic. Expires   Lic. Class or Type   Date Expires   Operator  Owner Vehicle ☐ Yes ☐

### OPERATOR AND/OR OWNER OF VEHICLE BEARING LICENSE

Plate No.   NY ☐ CT ☐ PA ☐ NJ ☐   Reg. Expires

| PAS | OMT | COM | OML |
|-----|-----|-----|-----|
| SEDAN | SUBN | 2 DR | 4 DR |

FORD HON Make   Other

**DISNF**

Plate Plate   State

VIN No.:

### THE PERSON DESCRIBED ABOVE IS CHARGED AS FOLLOWS

AM ☐   Time: *2:25* PM ☐   Date of Offense   County   Precinct

Place of Occurrence:

IN VIOLATION OF

Sec. *240.0.5* Sub   VTL ☐ Traf Rules ☐ Admin Code ☐ Penal Law ☐ Other ☐

Description of Criminal Court Offense (Including Traffic Misdemeanors): *Disorderly Conduct*

| SPEEDING | | DISOBEY TRAF CONT DEV | | Unspec. Veh. | Unreg. Veh. | Unlic. Oper. |
|----------|--|----------------------|--|--------------|-------------|-------------|
| MPH | in MPH Zone | ☐ Sign | ☐ Pave Mark'g | Uninsur. Veh. | Comm Veh. | Bus | Hdz/Mat. |
| | | ☐ Signal | | | | | |

The person described above is summoned to appear in CRIMINAL COURT

Located at: *346 Broadway*   Summons County: *NY*

Date of Appearance: 9:30 a.m.   day of   year

I personally observed the commission of the offense charged above. False statements made herein are punishable as a Class A Misdemeanor pursuant to Section 210.45 of the Penal Law. Affirmed under penalty of perjury.

Rank/Full Signature of Complainant:

Complainant's Full Name (printed):   Command Code

Agency/NCIC   Squad   Tax Registry No.

I acknowledge receipt of this summons. I understand it is my responsibility to read and comply with the instructions on my copy, and that my signature below is not an admission of guilt.

Name:

**RESPONDENT'S EXHIBIT**

CRIMINAL CO

2

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK



ANTOINETTE COSTANZO
215 W 105TH ST APT 2D APT 2D
NEW YORK, NY  10025-3958

The case(s) referenced below was dismissed on 01/27/2012 in Part SAP-D and was
sealed pursuant to Section 160.50 CPL.

No appearance in court is required regarding this matter.  Retain this notice for your records.

| Summons Number | Date Issued | Docket Number |
| --- | --- | --- |
| 4335682256 | 11/15/2011 | 2012SN009879 |

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK
346 BROADWAY
NEW YORK, NY  10013

ANTOINETTE COSTANZO
215 W 105TH ST APT 2D APT 2D
NEW YORK, NY  10025-3958

3

# ORIGINAL TRANSCRIPT

1

50-H HEARING

------------------------------------------------x

In the Matter of the Claim of

ANTOINETTE COSTANZO,

        -against-

THE CITY OF NEW YORK.

------------------------------------------------x

BLA#:  2012PI003753

                     160 Broadway
                     New York, New York

                     March 19, 2012
                     9:05 a.m.

        **EXAMINATION** of **ANTOINETTE COSTANZO**, held

at the above time and place, pursuant to

Notice, taken before Katherine Morgan, a

reporter and Notary Public within and for the

State of New York.

                     LEX#90093



# LEX
# REPORTING SERVICE, INC.
Professional Reporting Since 1980

2

1

2    A P P E R A N C E S:

3

4        BETH UNGER, ESQ.
             Attorney for Claimant
5            215 West 105th Street, #2D
             New York, New York 10025
6

7

8        DANIEL L. SCHNEIDER, ESQ.
             Attorney for Respondent
9            49 Walworth Avenue
             Scarsdale, New York 10583
10   BY:  KATE KARAKASSIS, ESQ., of Counsel

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1
2     A N T O I N E T T E   C O S T A N Z O, the
3              witness herein, first been duly sworn
4              by a Notary Public of the State of New
5              York, was examined and testified as
6              follows:
7     EXAMINATION BY
8     MS. KARAKASSIS:
9          Q     State your name for the record,
10    please.
11         A     Antoinette Costanzo.
12         Q     State your address for the
13    record, please.
14         A     215 West 105th Street, Apartment
15    2D, New York, New York, 10025.
16         Q     Good morning, Ms. Costanzo.  My
17    name is Kate Karakassis.  I am a lawyer.  I
18    am going to be asking you some questions
19    today about the claim you are making against
20    the City of New York.
21              The reporter is here to take down
22    everything you and I both say.  If I do not
23    myself clear and you do not understand the
24    question, let me know and I will repeat it.
25    But if you do answer a question we will

```
 1                    A. Costanzo              4

 2      assume you understood when I asked you it.

 3      Okay?

 4           A      Uh-huh.

 5           Q      Is that a yes?

 6           A      Yes, that's a yes.

 7           Q      The reporter is here to take down

 8      everything that we both say.  She cannot make

 9      a record of a gesture, nod of your head or

10      saying uh-huh or uh-uh.

11           A      Okay, I understand.

12           Q      Please wait until my question is

13      completely finished before you start to

14      answer.  That is harder than it sounds.  She

15      cannot make a record if we are both talking

16      at the same time.

17           A      Okay.

18           Q      Have you been known by any other

19      names?

20           A      No.

21           Q      Can I get your date of birth?

22           A      3/29/60.

23           Q      What is your Social Security number?

24           A      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.

25           Q      Since the incident that you are
```

A. Costanzo                    5

1
2    making a claim for occurred, have you applied
3    for or have you been receiving any Medicare
4    benefits?
5            A    No.
6            Q    Since the incident that you are
7    making a claim for occurred, have you applied
8    for or have you been receiving any Medicaid
9    benefits?
10           A    No.
11           Q    Are you currently employed?
12           A    Yes.
13           Q    Your occupation?
14           A    Attorney.
15           Q    Your employer?
16           A    The Legal Aid Society.
17           Q    Are you a citizen?
18           A    Yes.
19           Q    How long have you lived at the
20   105th Street address?
21           A    Thirteen years.
22           Q    Are you married?
23           A    No.
24           Q    Do you have any children?
25           A    No.

A. Costanzo                              6

1

2       Q       Any claim for lost wages as a

3   result of this incident?

4       A       No.

5       Q       Who were you living with on the

6   date of your accident?

7       A       It wasn't an accident.

8       Q       I am sorry, the date of your incident?

9       A       Who was I living with?

10      Q       Yes.

11      A       Beth Unger.

12      Q       Can I get your approximate

13  weight, please.

14      A       130 pounds.

15      Q       About how tall are you?

16      A       5' 5".

17      Q       Did you weigh approximately 130

18  pounds on the day of the incident?

19      A       I think so.

20      Q       Are you right- or left-handed?

21      A       Right-handed.

22      Q       I see you are wearing glasses

23  today.  Do you wear them for all activities

24  or only certain activities?

25      A       Certain activities.

```
 1                    A. Costanzo              7

 2        Q      Which?

 3        A      Distance.

 4        Q      Were you wearing them at the time

 5   of the incident?

 6        A      No.

 7        Q      Are you a licensed driver?

 8        A      I am.

 9        Q      When did you first get your license?

10        A      1977.

11        Q      Have you ever made another claim

12   against New York City or any of its agencies?

13        A      No.

14        Q      Have you ever made another claim

15   against New York State or any of its agencies?

16        A      No.

17        Q      Have you ever received public

18   assistance?

19        A      No.

20        Q      Do you owe any money to New York

21   City, for anything such as liens, judgments,

22   taxes, outstanding parking tickets?

23        A      No.

24        Q      Have you ever been convicted of a

25   crime?
```

A. Costanzo                                    8

1

2          A       No.

3          Q       What is the highest level of

4    education you have completed?

5          A       Law school.

6          Q       Have you ever worked for New York

7    City or the Board of Education?

8          A       Yes.

9          Q       Who did you work for?

10         A       Board of Education.

11         Q       When was that, from when to when?

12         A       About 1984 to 1989.

13         Q       What was your job title?

14         A       Teacher.

15         Q       Did you ever know of any names to

16   any witnesses to the incident that you are

17   making a claim for?

18         A       No.

19         Q       There is no claim for physical

20   injury, correct?

21         A       No.

22         Q       Are you making any claim for

23   psychological or emotional injuries?

24         A       Yes.

25         Q       Did you have any kind of health

A. Costanzo                           9

2    insurance coverage on the date of this incident?

3         A    Yes.

4         Q    What was it?

5         A    Oxford.

6         Q    Do you know your policy number,

7    identification?

8         A    No, I don't think -- my I.D.

9    number is 991-581-01.

10        Q    On the date of this incident were

11   you suffering from any chronic medical

12   problems such as diabetes, heart disease,

13   asthma, high blood pressure, anything else?

14        A    No.

15        Q    Have you ever applied for

16   disability benefits from Social Security or a

17   private insurance company or an employer?

18        A    No.

19        Q    Prior to this incident have you

20   ever had any kind of mental health counseling

21   such a psychiatrists, psychologist, social

22   worker, anything else?

23        A    No.

24        Q    Have you sought any kind of

25   mental health counseling since this incident?

```
1                        A. Costanzo                    10

2        A      No.

3        Q      Did you miss any work at all as a

4   result of this incident?

5        A      I did not.

6        Q      In the twenty-four hours before this

7   incident, had you had any alcoholic beverages?

8        A      Yes.

9        Q      What and when?

10       A      About twenty-four hours before

11  the incident I had two glasses of wine with

12  dinner.

13       Q      In the twenty-four hours before

14  this incident, did you take any kind of

15  over-the-counter or prescription medication?

16       A      Yes.

17       Q      What did you to take?

18       A      Claritin.

19       Q      Do you know when you took it?

20       A      Probably about eighteen hours

21  before the incident.

22       Q      What did you take the Claritin for?

23       A      Congestion.

24       Q      What kind of congestion?

25       A      It is an antihistamine.
```

1                       A. Costanzo                11

2        Q      Is that for nasal congestion?

3        A      Yes.

4        Q      Did you take any drugs in the

5   twenty-four hours before this incident?

6        A      No.

7        Q      What was the date of the incident?

8        A      November 15, 2011.

9        Q      What time of day did the incident

10  happen?

11       A      About 7:20 in the evening.

12       Q      You are referring to a document.

13  What is that, please?

14       A      It is a pink summons slip number

15  433568225-6.

16       Q      Can I make a copy of that, please?

17       A      Sure.

18              MS. KARAKASSIS:  Did this

19              get submitted to the Comptroller

20              with the Notice?

21              MS. UNGER:  No, it did not.

22              MS. KARAKASSIS:  We will

23              mark this.

24              (Summons was marked as

25              Respondent's Exhibit 1 for

```
1                    A. Costanzo                12
2                 identification, as of this time.)
3        Q       What location did the incident begin?
4        A       104th Street and West End Avenue.
5    On the west side of the street.  The west
6    side of West End Avenue.
7        Q       Was it north or south of 104th?
8        A       It was in the street on 104th Street.
9        Q       In the middle of the intersection?
10       A       Not in the middle of the
11   intersection.  At the intersection; at the
12   red light; behind the pedestrian walkway;
13   crossing 104th Street; north and south.
14       Q       104th Street goes east to west --
15       A       To the west.  West End goes north
16   and south.  I was on the corner of 104th and
17   West End Avenue, on the west side of West End
18   Avenue in the middle of the street on 104th
19   Street, sitting at a traffic light on my
20   bicycle.
21       Q       You were on West End?
22       A       I was on 104th Street.  I was
23   headed eastbound and I was sitting at a
24   traffic light on my bicycle, west of the
25   pedestrian path waiting for the light to change.
```

                              A. Costanzo                    13

2        Q       Were you in a lane for vehicular

3    traffic or a marked bike path or something else?

4        A       There was no marked bike path on

5    104th Street.  I was in the lane where you

6    have to ride your bike where, you know -- I

7    was not -- I was in the lane.

8        Q       You were in a lane for vehicular

9    traffic?

10       A       Yeah, vehicular traffic.  There

11   is no bike path there.

12       Q       As you were waiting for the light

13   to change were there any cars in front of you?

14       A       No.

15       Q       Were there any bikes in front of

16   you?

17       A       No.

18       Q       Do you know if there were any

19   bikes behind you?

20       A       No, there were no bikes behind me.

21       Q       Were you in the middle of the

22   vehicular lane or to the right or to the left?

23       A       I was toward the right.

24       Q       Were there any cars behind you

25   and to your left that you are aware of?

A. Costanzo                          14

1
2          A        Not when I first go there.
3          Q        After time did there come to be
4     cars to the left of you?
5          A        There came to be one car to the left.
6          Q        Were there any cars on West End
7     Avenue passing through the intersection as
8     you were waiting?
9          A        There were some.
10         Q        Traveling in what direction?
11         A        Both north and south.
12         Q        Were you helmeted?
13         A        Yes.
14         Q        What safety devices was your bike
15    equipped with?
16         A        Lights and a bell.
17         Q        Where were the lights located?
18         A        On the front of the bicycle and
19    on the back of the bicycle.
20         Q        Were they blinking lights or were
21    they constant?
22         A        Blinking lights.
23         Q        About how long had you been
24    waiting for the light to change before the
25    incident began?

```
 1                    A. Costanzo                15

 2        A      A few seconds.

 3        Q      Then what happened?

 4        A      Then a marked police car pulled

 5   up, very close alongside of me, just a couple

 6   of inches from my left side.  The -- one of

 7   the officers in the vehicle told --

 8        Q      How many officers were in the vehicle?

 9        A      Two.

10        Q      Were they both in front?

11        A      Yes.  In uniform.  In a marked

12   patrol car.

13        Q      Then what happened?

14        A      Then one of the officers, I don't

15   know which one, told me to move.  I gestured

16   to the red light and said what through the

17   red light.  At that point, I don't know if

18   it's the same officer or another officer

19   asked me for my identification.

20        Q      You do not know which officer?

21        A      I do not know which officer.

22        Q      Can you describe the officers?

23        A      They were both male.  One officer

24   I believe his name was Donati or Donato,

25   D-O-N-A-T-O.  They are both from the 24th
```

A. Costanzo                    16

1
2    Precinct.
3         Q      How did you learn they were from
4    the 24th Precinct?
5         A      That's the precinct that Donato
6    signed -- marked on his summons and that's
7    the local precinct.  So I said went through
8    the red light.  At that point one of the
9    officers asked me for my identification.
10        Q      Can we go back to the description
11   of the officers.  They were both males?
12        A      Both males.
13        Q      Can you make any further description?
14        A      Donato was a white male.
15        Q      Was this person --
16        A      He issued the summons.  I don't
17   know if the other officer was Latino or
18   white.  He was not African-American.  He was
19   not Asian.
20        Q      Did Officer Donato get out of his
21   car?
22        A      He did not.
23        Q      Did he have any distinguishing
24   facial hair or characteristics?
25        A      He had a uniform on.  I didn't

A. Costanzo                        17

notice any distinguishing characteristics.
Donato was the driver.

        Q      You gestured and said what,
through the red light and then what happened?

        A      Then one of the officers asked
for my identification.  Then I took off my
knapsack.  I opened up my knapsack.  I found
my identification and I handed him my
driver's license and my Office of Court
Administration secure pass.

        Q      Which officer did you hand your
identification to?

        A      I handed it to the passenger who
was not Donati.  I didn't -- I was closer to
the passenger side of the patrol car.

        Q      Then what happened?

        A      Then Officer Donati, the driver,
drove off.  He crossed West End Avenue and
then I saw him on the east end of West End
Avenue and 104th Street.

        Q      About how far down the block?

        A      He was about fifteen feet from
the intersection; east of the intersection.

        Q      Did he drive through a red light;

A. Costanzo                    18

2    do you know?

3         A     I don't know.

4         Q     Then what happened?

5         A     Then I put my knapsack back on.

6    When I looked up the light was red.  So I sat

7    there till it changed to green and then I

8    went through the intersection.  At this point

9    I rode up to the driver side because it was

10   Officer Donati who had been speaking to me

11   after I gave my I.D.

12        Q     You rode up to the driver's side?

13        A     Yes.

14        Q     Was the window of the police car

15   down or was it up or do you recall?

16        A     It was down.

17        Q     Then what happened?

18        A     I waited for Officer Donati to

19   give me instructions or to give me my I.D. back.

20        Q     Did you say anything to him?

21        A     I just rode up and stood there.

22        Q     Did you make eye contact with him?

23        A     Probably.  I don't recall.

24        Q     How about the other officer did

25   you make eye contact with him?

A. Costanzo                          19

1

2        A       I didn't.

3        Q       You did not say anything to

4    either officer?

5        A       Not until I was spoken to.

6        Q       Then what happened?

7        A       Officer Donati told me that where

8    I was standing was not a good spot because I

9    was going to block vehicles trying to go down

10   105th Street.  So I said to him we could do

11   this wherever you want Officer Donati.  I can

12   go on the sidewalk.  Just tell me what to do.

13       Q       Were you on 104th or 105th?

14       A       104th.

15       Q       You told him you would go --

16       A       Wherever he wanted.  He should

17   just give me instructions as to what I should

18   do.

19       Q       Then what happened?

20       A       Then he drove off again.

21       Q       Where did he drive to?

22       A       He drove to 104th Street and

23   Broadway and for a moment he stopped.

24       Q       At the intersection?

25       A       It seemed like it, yes.  It could

A. Costanzo                    20

have been before the intersection but at some

point he stopped.

    Q    Did he enter the intersection?

Did he go to the far side of the intersection

before he stopped or do you recall?

    A    I saw him stop prior to the far

side of the intersection.  So west of the

intersection at Broadway and 104th Street.

    Q    Before he drove off did he ever

give you any instruction about where

specifically you should go?

    A    No.

    Q    Did the other officer say

anything to you at all?

    A    No.

    Q    Then what happened?

    A    Then I rode down to 104th Street

and Broadway and he wasn't there any longer.

    Q    Then what did you do?

    A    Then I took my knapsack off again --

    Q    Where were you exactly at this

point?

    A    At the intersection of 104th

Street and Broadway on the west side of the

```
1                    A. Costanzo              21

2    intersection.

3         Q      Were you on the roadway, the

4    sidewalk or something else?

5         A      I was towards the side.  I don't

6    -- I'm not -- I wasn't on the sidewalk.   I

7    was riding my bike where the traffic drives.

8    I was on the right side stopped prior to the

9    intersection.

10        Q      You were towards the side of the

11   roadway?

12        A      Yes.

13        Q      Were you next to a parked car or

14   next to the sidewalk itself?

15        A      I think I was next to a parked car.

16        Q      Then what happened?

17        A      I took off my knapsack again and

18   I called my counsel.

19        Q      When you say "you called your

20   counsel," could you give a name.

21        A      I called Beth Unger and I

22   explained the situation.  That a police

23   officer had my identification and that I

24   didn't know where he had gone.  I was asking

25   advice.  Should I remain at that intersection
```

A. Costanzo                    22

or should ride to 100th -- I'm sorry, to

where the 24th Precinct is.  I didn't know

what to do about the fact that he had taken

my identification and was nowhere that I

could see.

        Q      That's what happened?

        A      My attorney advised me to remain

at that intersection.  I remained there for a

while and then at some point I saw the patrol

car coming from West End Avenue traveling

east towards Broadway.

        Q      You saw the patrol car on West

End Avenue?

        A      Turn from West End Avenue onto

104th Street.  Traveling east towards me;

towards Broadway.

        Q      About how long did you remain at

the intersection of 104th and Broadway before

you saw the patrol car return?

        A      A few minutes.

        Q      Can you estimate, one, two,

three, four, five, something else?

        A      I don't think it was as long as

ten minutes.  I don't know.

                        A. Costanzo                    23

1                Q       It was less than ten minutes?

2                A       I think it was less than ten minutes.

3                Q       Are you able to say more

4        specifically than that?

5                A       It was -- I don't know I had a

6        phone conversation.  I waited.  I was

7        anxious.  It is hard to estimate how much

8        time had gone by.

9                Q       You saw the patrol car traveling

10       east towards you, then what happened?

11               A       And it stopped where I was standing.

12               Q       To your left?

13               A       To my left.  Then Office Donati

14       handed me the summons that I have previously

15       referred to and my identification.

16               Q       Did the driver hand you this?

17               A       Donati was a driver, yes.

18               Q       Did he get out of the car to hand

19       it to you?

20               A       No, he didn't.

21               Q       How did he hand it to you?

22               A       He reached across the passenger

23       and gave it to me.

24               Q       Did he say anything to you while

1                           A. Costanzo                    24

2      the car was stopped next to you?

3           A     No.  I asked him for his shield

4      number because I didn't see it on the summons

5      and he gave it to me and I wrote it on the

6      back.  I wrote what he told me on the back of

7      the summons, which was 8434, and then made a

8      notation of 24th which would refer to the

9      24th Precinct.

10          Q     8434?

11          A     That's what I wrote on the back.

12     So I am assuming that's what he told me.

13          Q     He handed you the summons and at

14     that point you asked for his shield number?

15          A     I did.

16          Q     Then what happened?

17          A     Then he drove off.

18          Q     Was that the end of the incident?

19          A     Yes.

20          Q     I am going to ask you to look at

21     what is marked as Respondent's Exhibit 1,

22     which is a summons number 433568225-6.  Is

23     that the summons that was given to you the

24     day of the incident?

25          A     Yes.

```
 1                    A. Costanzo              25
 2        Q     Has there been a disposition for
 3   this summons; have you responded to it in any
 4   way?
 5        A     I responded to the summons on the
 6   date I was supposed to return at 346 Broadway
 7   and that was on the 31st day of January of
 8   2012.  When my counsel went to hand in the
 9   copy of my summons so the case could be
10   calendared, my counsel was told that the case
11   was dismissed.
12            The clerk wrote the letters
13   D-I-S-N-F on the face of the summons.  I
14   don't know what the reason was for its
15   dismissal.  I never received the back of the
16   summons which would include the factual
17   allegations against me.  I haven't seen those
18   so I don't know why it was dismissed.
19        Q     I am sorry maybe I misunderstood.
20   I thought you said you never saw the back of
21   the summons which would include the allegations --
22        A     Yeah, the police officer.
23        Q     -- I am looking at the summons.  I
24   do not see them.  Maybe I am missing them?
25        A     This is the copy that is given to
```

A. Costanzo                                      26

the person receiving the summons.  The police

officer, actually, on a universal summons

writes a factual allegation.  Including

which, would be the facts that would make up

the alleged charge.  In this case Penal Law

2420, subsection 5, Disorderly Conduct.

             The copy I'm given as a receiver

of the summons doesn't have that.  However,

when one goes to court to make an appearance

on the summons, that portion that the officer

has filled out is provided to either the

defendant or counsel.  So I have never seen

that portion since the case ultimately did

not get calendared in court.  It was

dismissed prior to being -- me appearing

before a judicial officer at 346 Broadway.

        Q     My understanding is you never saw

the back of the police officer's copy of the

summons?

        A     That's right.  So I have no idea

what factual allegations he made against me

alleging that I was in violation of Penal Law

Statute 2420, subsection 5.

        Q     Did you go to court on January

A. Costanzo                              27

1

2    31st or did you appear by counsel?

3          A       I arrived as well, my appearance

4    was required.

5          Q       Did you intern any attorney's fees?

6          A       I didn't.

7          Q       What damages are you claiming?

8          A       Emotional damages.  I suffered

9    anxiety, stress, loss of sleep, loss of appetite.

10         Q       For how long did you suffer these

11   symptoms?

12         A       Until January 31st when this case

13   was dismissed.

14         Q       Did you know what penalty may be

15   imposed if you are found in violation?

16         A       I know that there is a maximum

17   fifteen-day jail sentence.  I knew that if I

18   were found guilty of disorderly conduct that

19   the court record of that is not sealed.  I

20   knew that if I was found guilty of that I

21   would have to pay court fees.  That I could

22   be sentenced to and found guilty to a fine or

23   community service.

24         Q       Do you know how much of a fine?

25         A       I think the maximum fine on a

```
 1                        A. Costanzo                    28
 2     violation is $250 now and any court
 3     surcharges.  Also mandatory court surcharges.
 4     I think on a violation those are $75.
 5          Q     Have you ever been arrested prior
 6     to this incident?
 7          A     I was arrested one time in
 8     connection with protests at 1 Police Plaza
 9     with respect to the killing of Amadou Diallo.
10          Q     Do you know what the charge was
11     for that?
12          A     I think it must have either been
13     disorderly conduct or trespass.
14          Q     What happened as result of that
15     arrest?
16          A     The case was dismissed.
17          Q     About when did that happen?
18          A     I don't remember when Amadou
19     Diallo was killed by four police officers in
20     the Bronx.  It was a number of years ago.
21     More than ten years ago.
22          Q     Can you tell me currently how is
23     this incident affecting your life?
24          A     Well, I was charged with a penal
25     statute.  I am a criminal defense attorney.
```

A. Costanzo                    29

1    I practice in this courthouse all the time

2    and I knew as a criminal defendant in a case

3    in a courthouse where I practice that I would

4    certainly have to disclose this information

5    to my boss.  So the next morning I went into

6    his office and disclosed that I had received

7    the summons and that I was charged with a

8    violation of penal law.  So certainly that

9    was extremely humiliating since I have been

10   an attorney in this office, a respected

11   attorney in this office, for more than twenty

12   years.  It was rather troubling that I had to

13   tell my boss that I had received the summons.

14            In addition, I knew that I was

15   not going to plead guilty in the case which

16   would then require a trial.  That trial would

17   be conducted at 100 Centre Street where I

18   practice every single day.  I would have to

19   be tried by a judge I most certainly appear

20   in front of all the time.  That caused

21   tremendous stress; that I would have to

22   appear as a defendant before a judge where I

23   practice as an attorney and an advocate every

24   day.

A. Costanzo                          30

1

2          I assumed that if the case were

3    to go to Criminal Court it would be

4    transferred from 346 Broadway to 100 Centre

5    Street for the trial; that I would be

6    prosecuted by the office of the New York

7    County District Attorney's Office; which of

8    course would create a problem given the fact

9    that I represent people who are accused of

10   crimes by the District Attorney's Office.

11          It would lead to disclosure to my

12   clients that I was being prosecuted by the

13   same entity that was prosecuting them.  I

14   think that that was going to cause a conflict

15   of interest which would require me not to

16   appear.  I was to either disclose the

17   conflict to my clients, which again, would be

18   tremendously humiliating or I would have to

19   be relieved from those cases during the

20   period where I was on trial at 100 Centre

21   Street.  So that caused tremendous anxiety.

22          Q    Can you be more specific as to

23   what conflict of interest?

24          A    Well, if I were to be prosecuted

25   by the District Attorney's Office I also

A. Costanzo                                31

2    represent clients who are being prosecuting

3    by the District Attorney's Office.  Being

4    prosecuted by the same entity, I think that

5    I'm required to explain to my clients that I

6    am also being prosecuted by the same entity

7    that is prosecuting my clients.  I think as --

8         Q     Apparently you attorney is

9    suggesting a response.

10        A     Yes, that I would also have to

11   disclose conflict of interest to a judge who

12   would have to -- if my client were waiving

13   the conflict, I think he would have make

14   inquiries as to my clients -- as to whether

15   they knowingly waived any conflict of

16   interest.  So that became a tremendous stress

17   for me because I knew I was not going to

18   plead guilty on this case and it was going to

19   come to that.

20             In addition I would have to

21   appear in front of -- in Criminal Court, in

22   front of all the colleagues, from my office,

23   from my colleagues in the courthouse.  I

24   would have to appear for the court officers

25   that have to deal with every day as an

A. Costanzo                    32

2  attorney.  And the potential to that, for

3  that, was to be extremely stressful.  I felt

4  very anxious about it.  I felt they

5  humiliated me by this situation I had been

6  placed in by Officer Donati.

7      Q    Your prior arrest, when you were

8  charged either with trespass or disorderly

9  conduct, were you also working as an attorney

10 at that time?

11     A    I was.

12     Q    In the same office?

13     A    Yes.

14     Q    Did you experience the same

15 stress at that time?

16     A    No, that was a political protest.

17 I was actually very proud of the fact that I

18 had been arrested; that I had taken a stand

19 against police violence.  I, along with many

20 New Yorker's got arrested; along with many

21 celebrities, got arrested.  It was very

22 different from being summoned for conduct

23 that is obviously -- my disorderly conduct

24 charge was not political, not just, and the

25 situation was entirely different.

A. Costanzo                      33

1
2      Q      When you talk about conflict of

3   interest.  Did you happen to become aware of

4   or could you refer me to a specific code of

5   ethics, law of ethics that you believe that

6   you would have been in violation of that

7   would have constituted a conflict of interest?

8      A      Can I confirm with my attorney?

9      Q      Yes.

10     A      So, I can't cite to a specific

11  statute from the ethical code.  However,

12  counsel for our office in the past, where

13  someone has been arrested and charged with

14  penal law statute, has required that our --

15  that the clients -- well, required that the

16  attorney no longer appear in Criminal Court,

17  with clients, because at least as far as our

18  office is concerned, that being prosecuted by

19  the same entity and the client you represent

20  creates a -- at least the appearance of a

21  conflict of interest.

22     Q      Your own office has a policy?

23     A      Yes.

24     Q      That you would not be able to

25  appear with clients if you are being prosecuted?

<pre>
 1                          A. Costanzo                    34

 2           A      By the District Attorney's

 3      Office, yes.

 4           Q      What specific office do you work at?

 5           A      The Criminal Defense Practice

 6      located at 49 Thomas Street.

 7           Q      Who is your supervisor?

 8           A      Shanthi Narra.

 9           Q      Can you spell that?

10               MS. UNGER:  I think she

11               means the one who you told about

12               the summons.

13               THE WITNESS:  I disclosed the

14               summons to the head of my borough

15               office, his name is Irwin Shaw.

16           Q      Do you plan to seek any kind of

17      mental health treatment as a result of this?

18           A      No.

19           Q      During the month or approximate

20      month, month and a half between the time you

21      learned the case had been dismissed and the

22      time you got this summons, were your work

23      duties changed in any way?

24           A      Well, it's actually two and a

25      half months.
</pre>

```
1                      A. Costanzo              35

2          Q     November 15th to January 31st, during

3     that time had your work duties been modified?

4          A     No.

5                     MS. KARAKASSIS:  Off record.

6                     (Whereupon, a discussion was

7                 held off the record.).

8          Q     In regards to damages.

9          A     This officer summoned me for

10    conduct that I didn't commit.  I never

11    blocked pedestrian or vehicular traffic.  I

12    was just sitting at a red light.  So I have

13    real questions about this officer's

14    integrity.  And when he drove off with my

15    identification and license and drove off to

16    where I could even see where his patrol car

17    was any longer -- he left the scene with my

18    identifying information.  I became very

19    anxious that this officer was -- I don't know

20    doing something with identification.

21                 I know he has access to a DMV

22    computer.  I was very concerned that he might

23    be doing something with that.  I was very

24    concerned that he had access to my address.

25    I was concerned that he had all of my
```

A. Costanzo                    36

identifying information.  I don't know what

he did with my identification while he was no

longer in my presence.  So that certainly

created a bit of anxiety for me.

            In addition, this is my

neighborhood.  I was about three blocks from

my home.  Now, when I ride my bicycle in that

neighborhood I am always concerned that I am

going to see this officer.  That he is going

to ticket me for absolutely no reason and

that he is going to put me through the same

humiliation that he did on November 15th.

            So I am very concerned with

riding my bike in my neighborhood.  You know

every time I stop at a stoplight, you know, I

look around for a marked patrol car with the

concern that Officer Donati is inside and

will find some incident to fabricate and

summons me back to Criminal Court.

      Q      Have you ever seen this officer

that gave you this summons prior to this incident?

      A      I have no recollections of seeing

him prior to the incident.

      Q      Have you seen him since the incident?

```
 1                        A. Costanzo                37
 2          A      I have not.  Not that I know of.
 3          Q      Did you make a complaint to the
 4    CCRB concerning this incident?
 5          A      I did not.
 6          Q      Have ever been jailed prior to
 7    this incident?
 8          A      No.
 9                 MS. KARAKASSIS:  Thank you
10                 very much.
11                        -o0o-
12                 (Whereupon, the examination
13                 of Antoinette Costanzo was concluded
14                 at 9:50 a.m.)
15
16                 _____
17                   ANTOINETTE COSTANZO
18
19
20
21    Subscribed and sworn to
      before me on this ____ day
22    of _____, _____.
23
24    _____
      NOTARY PUBLIC
25
```

38

C E R T I F I C A T E

I, KATHERINE MORGAN, a reporter

and Notary Public within and for the

State of New York, do hereby certify:

That the witness(es) whose

testimony is hereinbefore set forth

was duly sworn by me, and the

foregoing transcript is a true record

of the testimony given by such witness(es).

I further certify that I am not

related to any of the parties to this

action by blood or marriage, and that

I am in no way interested in the

outcome of this matter.


*Katherine Morgan*
KATHERINE MORGAN